1   Gerald L. Roylance
    1168 Blackfield Way
2   Mountain View, CA 94040-2305

3   Phone 1-650-948-1790

4   Pro se



5

6

7                    **United States District Court**
8          **Northern District of California, San Jose Division**

9   GERALD ROYLANCE,                    Case No.: 14 CV 02445 PSG
            Plaintiff,
10          vs.                         APPLICATION FOR DEFAULT JUDGMENT
                                        AGAINST:
11  ALG REAL ESTATE SERVICES, INC. d/b/a   ALG REAL ESTATE SERVICES, INC. d/b/a
    AMERIFUND LENDING GROUP;              AMERIFUND LENDING GROUP;
12  MARK AUGUSTUS;                        MARK AUGUSTUS;
    DONECIA LA SHAUN AUGUSTUS;            DONECIA LA SHAUN AUGUSTUS
13  DOES 1-200
            Defendants                  FRCP 55(b)
14
                                        Judge: Hon. Paul S. Grewal
15                                      Date: Tuesday, 6 January 2015
                                        Time: 10:00AM
16                                      Courtroom: 5 (4th floor)

17          As provided by Rule 55(b) of the Federal Rules of Civil Procedure, Plaintiff Gerald Roylance

18  moves for entry of a default judgment against the following Defendants for failure to plead or otherwise

19  defend this action in a timely manner.  The complaint was filed on 27 May 2014.  Defendants ALG

20  REAL ESTATE SERVICES, INC., MARK AUGUSTUS, and DONECIA LA SHAUN AUGUSTUS

21  were served by a registered process server on 17 and 18 July 2014.  They failed to appear or otherwise

22  respond to the suit, so plaintiff requested their defaults on 29 August.  The clerk entered their defaults on

23  15 September 2014.  Consequently, the Defendants have admitted all well pled allegations in the

    Complaint.

24          The individual defendants are beyond military age, they are not infants, and they are not

25  incompetent.

                                         1

1    Wherefore, plaintiff moves that the Court enter a judgment for TCPA statutory damages of

2  $22,500 plus Civil Code § 3294 exemplary damages of $96,000 joint and several against the individual

3  Defendants.  In addition, the individual Defendants should be permanently enjoined from violating the

   TCPA, the FCC regulations promulgated under the TCPA (47 C.F.R. § 64.1200 and 47 C.F.R. §

4  64.1601), Business & Professions Code § 17500.3, and Public Utilities Code §§ 2871-2876.

5    Plaintiff also moves that the corporate Defendant should be joint and severally liable for $7,500

6  in TCPA statutory damages and $16,000 in Civil Code § 3294 exemplary damages.  In the alternative,

7  the Court may find that the corporate Defendant be joint and severally liable for the same amounts as the

   individual Defendants because it did not defend and has admitted all the allegations in the complaint.

8    This request is based on the file and the attached Declaration of Plaintiff.

9    Dated December 1, 2014

10

11    Gerald Roylance

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2

Gerald L. Roylance
1168 Blackfield Way
Mountain View, CA 94040-2305

Phone 1-650-948-1790

Pro se

## United States District Court
### Northern District of California, San Jose Division

| | |
|---|---|
| GERALD ROYLANCE, <br> Plaintiff, <br> vs. <br><br> ALG REAL ESTATE SERVICES, INC. d/b/a <br> AMERIFUND LENDING GROUP; <br> MARK AUGUSTUS; <br> DONECIA LA SHAUN AUGUSTUS; <br> DOES 1-200 <br> Defendants | Case No.: 14 CV 02445 PSG <br><br> MEMORANDUM IN SUPPORT OF <br> APPLICATION FOR DEFAULT JUDGMENT <br><br> Judge: Hon. Paul S. Grewal <br> Date: Tuesday, 6 January 2015 <br> Time: 10:00AM <br> Courtroom: 5 (4th floor) |

Defendants in this lawsuit were served with the summons, but they have not appeared. They were served with the application for default, but they did not respond. Consequently, they have admitted all well pleaded allegations in the Complaint.

Plaintiff seeks statutory damages, exemplary damages, and injunctive relief. Consequently, a court hearing is required.

## I. STATUTORY DAMAGES

The statutory damages stem from the TCPA causes of action at 47 U.S.C. § 227(b)(3) (First Cause of Action, automated calls) and 47 U.S.C. § 227(c)(5) (Second Cause of Action, do not call violations).

Although plaintiff believes that that those causes of action permit damages for each violation of the statute or its FCC regulations, plaintiff is not seeking damages for multiple violations per call per cause of action.

1

### A. First Cause of Action

The First Cause of Action (TCPA subsection (b)) identified six prerecorded calls that were placed to plaintiff's residential telephone during 2010.  Plaintiff answered two of these calls, and the other four were taken by his answering machine.  The TCPA prohibits the initiation of a call using a prerecorded voice to a residential telephone without prior express consent.  47 U.S.C. § 227(b)(1)(B). All of the calls were initiated and all of the calls delivered a prerecorded message.

The statutory damages under 227(b)(3) have a minimum of "$500 in damages for each such violation".  The Complaint alleges the initiation of 6 prerecorded calls that offered mortgages at 4.5 percent interest rate.  These calls were either answered by the plaintiff or captured by plaintiff's answering machine.  The statute does not require the plaintiff to answer each call; the statute prohibits any person "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party". (47 U.S.C. § 227(b)(1)(B).)  The violation is the initiation of the call whether or not it is answered.  Plaintiff did not give prior express consent for any of these calls.  In fact, plaintiff made a written do-not-call request after receiving the first prerecorded call; such a request shows the calls were not welcome.  Despite that request, there were 5 subsequent prerecorded calls.

The FCC is empowered to exempt some prerecorded calls.  The FCC did not exempt calls that are an "unsolicited advertisement" or are part of an advertising campaign; the FCC exempted calls "made for a commercial purpose but does not include or introduce an unsolicited advertisement or constitute a telephone solicitation".  (47 U.S.C. § 227(b)(2)(B); 47 C.F.R. § 64.1200(a)(2)(iv) [2007].) The text of the prerecorded calls and the loan documents sent to plaintiff show the point of the calls were to advertise mortgage services.  The calls advertised a 30-year mortgage at 4.5 percent interest. The calls were unsolicited advertisements; they also constituted telephone solicitations.  The calls are not exempt.

Plaintiff seeks TCPA statutory damages for each of the six prerecorded calls.

### B. Second Cause of Action

The Second Cause of Action involves the six prerecorded calls above, two live calls, and a written request for a do-not-call policy (DNCP).  This cause of action is not concerned with automated calls but rather privacy issues.  The FCC has determined that all telemarketers must follow certain procedures that involve providing verbal identification and maintaining company specific do-not-call

Memorandum in support of Application for Default Judgment

1   lists.  (47 C.F.R. § 64.1200(c) and (d).)  In addition, the FCC requires that telephone solicitations

2   provide Caller ID information.  (47 C.F.R. § 64.1601(e) [2003].)

3        Under this TCPA subsection, a person who calls for telemarketing purposes must provide

    identity information, must record and honor do-not-call requests, must have a do-not-call policy

4   available on demand, and must provide Caller ID information.

5        Each of the eight telephone calls had one or more TCPA subsection (c) violations.  All of the

6   calls, for example, blocked Caller ID.  The demand letter requested a do-not-call policy, but one was not

7   sent despite a warning that failure to do so risked $1,500 in statutory damages.

8        None of the six prerecorded calls identified the caller or provided a telephone number.  "A

    person or entity making a call for telemarketing purposes must provide the called party with the name of

9   the individual caller, the name of the person or entity on whose behalf the call is being made, and a

10  telephone number or address at which the person or entity may be contacted."  (47 C.F.R. §

11  64.1200(d)(4) [2007].)  The calls did not identify ALG REAL ESTATE SERVICES, INC.  Pressing 1 is

    not a telephone number.  (Even if we assume "1" is a telephone number, it would be for the prerecorded

12  message player.  The FCC has made clear that the telephone number given may not be the telephone

13  number of an autodialer; see 47 C.F.R. 64.1200(b)(2) stating "telephone number (other than that of the

14  autodialer or prerecorded message player that placed the call)".)

15       None of the six prerecorded calls or two live calls provided Caller ID.  (47 C.F.R. § 64.1601(e)

16  [2003].)

17       After the first prerecorded call and the two live calls, plaintiff made a do-not-call request in his

    demand letter to MARK AUGUSTUS and ALG REAL ESTATE SERVICES, INC.  That do-not-call

18  request should have stopped all further solicitations (even live calls), but there were five subsequent

19  identical prerecorded calls offering mortgage services.

20       FCC Regulations at 47 C.F.R. § 64.1200(d)(5) make a do-not-call request apply to affiliated

    entities if "the consumer reasonably would expect them to be included given the identification of the

21  caller and the product being advertised".  A do-not-call request was made to both MARK AUGUSTUS

22  and ALG REAL ESTATE.  A consumer would reasonably expect the request to stop all identical

23  anonymous prerecorded calls about mortgages (the person with the identical message would be the same

24  caller).  A consumer would reasonably expect the request to stop all calls from MARK AUGUSTUS

    about mortgages.  A consumer would reasonably expect the request to stop all calls from the same loan

25  originator (DONECIA AUGUSTUS).

3

Consequently, the five subsequent prerecorded calls failed to honor a do-not-call request (in addition to other 47 U.S.C. § 227(c) violations).

All eight of the telephone calls involved one or more violations of the FCC regulations.

The plaintiff sent a demand letter, and that demand letter requested a DNCP. A DNCP was not sent. "Thus, we find that AT&T violated section 64.1200(e)(2)(i) of the Commission's rules by not making a copy of AT&T's do-not-call policy available to Biggerstaff upon his May 8, 1997 demand." (*In the Matter of Consumer.Net v AT&T Corp.*, Federal Communications Commission, 17 December 1999, File E098-46, FCC 99-401.)

Consequently, there are at least 9 compensable violations of 47 U.S.C. § 227(c). The Court is free to assess damages from 0 to $500 for each violation. (47 U.S.C. § 227(c)(5)(B) stating "up to $500 in damages for each such violation".)

Plaintiff asks for statutory damages for at least nine violations: 8 violative calls and 1 failure to provide a do-not-call policy. Honest advertisers do not hide their identity; they want to build a brand name. A legitimate mortgage broker would not need to suppress Caller ID. An advertiser that was using illegal prerecorded calls to contact consumers would have an interest in suppressing its identity and Caller ID. Beside the point that it would not want to be sued, the caller also would not want to field calls from irate consumers.

There is no double billing of the violations in the First and Second Causes of Action. The TCPA is a remedial statute, and different violations must be shown in the different causes. The First Cause of Action is about automated calls and only addresses the six prerecorded calls; the Second Cause of Action is not about automated technology but rather violating do-not-call regulations promulgated by the FCC. The two causes require proof of different facts. *Blockburger v. United States*, 284 U.S. 299 (1932). See also *Lovgren v. Byrne*, 787 F.2d 857 (3rd Circuit 1986) where cumulative punishment for violating distinct regulations is permissible.

### C. Trebling statutory damages

For both TCPA causes of action, the TCPA allows the damages to be trebled if the actors "willfully or knowingly" violated the statute. The interpretation of these terms does not require the actor to intentionally violate the statute; it requires only that the actor intend to do the act.

The proper construction of "willful" within the context of the 1934 Communication's act is set forth at 47 U.S.C. § 312(f), and reiterated in *In re Southern California Broadcasting Co.*, 6 FCC Rcd.

4

4387 (1991). An amendment to the 1934 Communications Act, established a statutory definition for the term "willful" at 47 U.S.C. § 312(f)(1):

> The term "willful," when used with reference to the commission or omission of any act, means the conscious and deliberate commission or omission of such act, irrespective of any intent to violate any provision of this chapter [Chapter 5 of the Communications Act] or any rule or regulation of the Commission authorized by this chapter or by a treaty ratified by the United States.

Congress further stated that this statutory definition would control "for any other relevant section of the [1934 Communications] Act." H.R. Conf. Rep. No. 765, 97th Cong., 2nd Sess. 1982, 1982 U.S.C.C.A.N. 2261, at ¶ 50. The TCPA, as an amendment to the 1934 Communications Act, is such a relevant section since it uses "willful" as the defined term of art.

The result of the statutory definition and FCC construction of "willful" is to remove any element of evil intent or malice from the term, which is a common construction in the law. Other authorities recognize that "willful" can be used in a sense which does not imply any malice or wrongdoing.

Intent to do a wrongful act is not an essential element of willfulness. It implies nothing blamable, but simply the act of a free agent. *Smith v. Wade*, 461 U.S. 30 (1983), n 8, citing 30 American and English Encyclopedia of Law, 529-530 (2d ed. 1905) (footnote omitted).

To avoid a finding of willfulness, it is important to distinguish the nature of the conduct (which must be unintentional), and not the violation of the regulation to which the conduct led. The FCC has used the example of "bumping a switch" as an example of a non-willful act that could give rise to a violation that would not be construed as willful. *In re Valley Page*, 12 FCC Rcd. 3087 at [*9] ¶ 6, 1997 WL 106481 (F.C.C.). ("[W]illfulness exists if there is a voluntary act or omission in that a person knew that he was doing the act in question such as using a radio transmitter, as opposed to being accidental (for example, brushing against a power switch turning on a radio transmitter).") In addition, the FCC has consistently found willfulness where "laxity" has led to preventable violations. *In the Matter of Liability of Midwest Radio-Television, Inc.*, 45 FCC 1137, 1141 (1963). In the case of the TCPA and as used by the FCC, "willful" simply means that the act out of which a violation arises was not an accident or mistake, even if the resulting violation was unintended. Accordingly, a "willful" violation of the TCPA exists where there is a conscious and deliberate commission or omission of an act which results in a violation, irrespective of any intent to violate any law or regulation.

5

The violations should be viewed as willful.  Defendants intended to use prerecorded calls to sell their mortgage services.  There was no accident that caused the messages to be sent.  Defendants were notified after the first prerecorded call, but they did not respond to that demand letter.  They have not denied using prerecorded calls.  In fact, plaintiff received 5 additional identical prerecorded calls after the demand letter.

The caller clearly intended to send prerecorded solicitations; the caller knowingly used a prerecorded message to sell mortgage services.  Furthermore, a demand letter was sent after the call on 28 May 2010 but before the five subsequent calls; prerecorded calls were used after notice.  Consequently, the violations are willful or knowing in the sense used by the TCPA.  The statutory damages for the prerecorded calls may therefore be trebled to $9,000.  This amount was requested in the Complaint on page 10.

Repeatedly sending prerecorded messages shows intent.

In addition, the calls blocked Caller ID.  One must choose to block Caller ID; the default case is that Caller ID is transmitted; blocking is a deliberate choice.

Consequently, the court has the authority to treble all TCPA statutory damages.

For the First Cause of Action, the six violations should be trebled to $9,000.  This amount was requested in the Complaint on page 10.

For the Second Cause of Action, the nine violations should be trebled to $13,500.  This amount was requested in the Complaint on page 10.

That's a total of $22,500 in TCPA statutory damages.

## II. <u>EXEMPLARY DAMAGES</u>

California Civil Code § 3294 is an attachment to tort actions.  The complaint made the attachment for both TCPA causes of action.

Trebled TCPA statutory damages do not require a showing of fraud or malice as defined by § 3294.  The Civil Code section's exemplary damages require dispicable actions.

The prerecorded calls hid the identity of the caller.  The prerecorded calls did not identify the caller.  Caller ID was blocked on both the prerecorded and the live follow up calls.  Plaintiff needed to respond to the prerecorded message and show interest in order to identify the caller; if plaintiff did not do that, then he would never have learned the caller's identity.

Memorandum in support of Application for Default Judgment

Under the TCPA and other laws, a telemarketer is required to provide identification. Suppressing that information is "fraud" under Civil Code § 3294; it is the concealment of a material fact that would deprive plaintiff of legal rights; plaintiff cannot sue a ghost in the wind.

The prerecorded calls also show "malice". The prerecorded calls were made knowing that they were illegal and would injure recipients.

Honest advertisers do not hide their identity. The efforts at hiding identity information should be viewed as intentional acts to make identifying and punishing the caller more difficult. Furthermore, the Defendants were on notice that the calls violated the TCPA and other laws when the five subsequent calls were made.

After receiving the first prerecorded call and identifying the caller, the plaintiff sent demand letters to both Mark Fleischmann at ALG REAL ESTATE SERVICES, INC. and MARK AUGUSTUS. Neither recipient responded. Plaintiff was never offered a remedy for the prerecorded call. A minimum remedy for a prerecorded telephone solicitation would be the minimum statutory damages of $500.

A defendant ratifies the bad acts of an agent by failing to redress the injury: "Ratification ... may be established by any failure to repudiate and redress." None of the Defendants have offered to redress the injuries to plaintiff. Minimum statutory damages for a single prerecorded call are $500. By failing to offer plaintiff minimum statutory damages, Defendants have ratified the prerecorded calling campaign.

Although the requested statutory damages of $22,500 may seem steep on its own, it is inadequate deterrent for large telemarketers. Defendants have mounted an apparently state-wide campaign to sell mortgage services. For a modest loan of $270,000, the loan originator would be paid $1200. Plaintiff does not have discovery because the Defendants did not respond, but closing twenty loans would cover the statutory damages would cover the requested statutory damage.

The Defendants have a large operation. Defendants have probably made calls throughout the state.

If we believe DONECIA MONTGOMERY's claims, 1st Global Diversified Inc. had at least $500,000 in annual revenue. (Roylance Decl. ¶ 30.) That amount suggests originating 400 loans per year, and it seems likely that those loans would be the result of prerecorded telemarketing. That telemarketing is not only illegal, but the illegal telemarketing would have taken business away from honest mortgage agents who were operating legally.

Memorandum in support of Application for Default Judgment

It would be an absurd result if the individual Defendants could violate the TCPA, make $500,000 in annual revenue with illegal telemarketing, and just pay an indulgence of $22,500. The numbers do not deter illegal activity. The individual Defendants are not good citizens; they've been making these calls for years. (Roylance Decl. ¶¶ 144-157.)

"Deterrent effect may be achieved without awarding exemplary damages. Whether an award accomplishes this purpose, in addition to affording compensation, is determined by considering not only the amount allowed to each plaintiff for each violation but also the total amount of the award, the nature and persistence of the violations, the extent of the defendant's culpability, damage awards in similar cases, the defendant's ability to prevent future violations of the Act, the substantive or technical nature of the violations, and the circumstances of each case. Plainly, it ought not to be cheaper to violate the Act and be sued than to comply with the statutory requirements." (*Beliz v. W. H. McLeod & Sons Packing Co.,* 765 F.2d 1317, 1332 (5th Circuit 1985), emphasis added.)

The broker Defendant ALG REAL ESTATE SERVICES, INC. is even bigger. At the time, it claimed 268 branches and 93 licensed salespeople. (Roylance Decl. ¶ 2.)

Plaintiff's 3 June 2010 demand letter mentioned $54,000 in punitive and/or exemplary damages, but that threat did not deter Defendants. (Roylance Decl. Exhibit A.) The same prerecorded message was sent to the plaintiff five more times. (Complaint ¶¶ 37-41.)

Plaintiff reserved $96,000 in exemplary damages. (Complaint, page 10.) The logic behind that amount is simply six prerecorded calls at $16,000 per prerecorded call. The $16,000 is the amount that the FCC can levy for a single violation (which is $10,000 per violation with an inflation adjustment to $16,000).[1] A *BMW v Gore* 517 U.S. 559 (1996) guidepost for punitive damages is the amount of government sanctions: "Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness." (*BMW* 517 U.S. @ 583.)

In 2006 (when the maximum FCC forfeiture per violation was limited to $11,000), the FCC's practice was to impose a forfeiture of $10,000 for each prerecorded call that also violated a do-not-call request: "In cases where a party has continued to deliver prerecorded messages after a request to stop, we have increased the forfeiture amount to $10,000 per violation."[2]

---

[1] FCC, "Adjustment of Civil Monetary Penalties to Reflect Inflation," 1 August 2013, DA 13-1615
http://www.fcc.gov/document/fcc-adjusts-maximum-forfeiture-penalties-based-inflation
[2] FCC, 22 June 2006, Order of Forfeiture, DA 06-1303, ¶ 11, https://apps.fcc.gov/edocs_public/attachmatch/DA-06-1304A1.pdf.

Memorandum in support of Application for Default Judgment

Plaintiff believes that imposing punitive damages of $16,000 per prerecorded call is warranted here. Defendants, who are located in Southern California, were calling into Northern California. Presumably, they were calling throughout the state. The prerecorded calling campaign was taking business away from legitimate mortgage brokers who could not compete with low-cost automated calling. The individual Defendants stood to make $1200 on a small ($270,000) mortgage to plaintiff. DONECIA AUGUSTUS became a real estate broker on 8 August 2010; plaintiff received 5 of the 6 prerecorded calls after that date. As a broker, she could make money on both the loan origination fee and the interest differential. The individual Defendants could easily have made more than $96,000 by making prerecorded calls throughout the state. They should not profit from this scheme; it would not encourage them to stop. By failing to answer the complaint and submit to discovery, they have deprived the plaintiff of learning the extent of their profits, the identity of others who participated (such as any voice broadcaster or lead generator), and complaints or objections by other consumers.

Also, look at the number of distinct FCC violations that occurred within each call. (Complaint ¶¶ 57-65.) The last 5 calls were prerecorded, they did not identify the actual caller (presumably the individual Defendants), they did not identify the on-behalf of seller (ALG), they did not provided a telephone number during the message, they did not provide Caller ID, and they violated do-not-call requests. The effort here is not geared toward legitimate advertising and following telemarketing regulations but rather toward avoiding identification so as to avoid prosecution. There is plenty of malice.

It is a boon to the Defendant to give him a situation where the Defendant can commit additional TCPA injuries with impunity. If there are no additional damages for additional violations, then the Defendant is encouraged to commit additional violations to make it more difficult to identify him and insulate the Defendant from liability. That is part of the malicious game that is being played here.

The corporate Defendant, ALG REAL ESTATE SERVICES, INC., is a more complicated situation. There is no doubt that it was involved with the May and June 2010 calls because its name appeared on the loan documents sent to plaintiff. The complication is the individuals and ALG may have gone their separate ways after the first call. DONECIA AUGUSTUS' NMLS document suggests that her representation of ALG REAL ESTATE ended in June 2010, which is after the first prerecorded call but before the subsequent five prerecorded calls. Consequently, ALG may have nothing to do with the last five calls. ALG has not answered, so it has not raised that defense. It has, in fact, admitted the allegations of the Complaint by not answering.

9

There is the possibility that after receiving plaintiff's demand letter in June 2010, ALG terminated it relationship with the individual Defendants. (Roylance Decl. ¶ 42.) Plaintiff does not know if that is what happened; ALG did not respond to the plaintiff's demand letter or answer the Complaint. If that were the case, one would expect ALG to defend on that issue. As it stands, plaintiff does not know what happened.

In any event, ALG did not send plaintiff a do-not-call policy despite a certified letter, so ALG failed to act correctly on its own. (Complaint ¶¶ 33-36.) ALG did not offer any remedy to plaintiff for the May and June calls described in the letter. The implication is that ALG has ratified the bad acts of the individual Defendants due to its failure to redress the wrong. (*Roberts v. Ford*, 224 Cal.App.3rd 793 at 801.)

Consequently, ALG should be subjected to the May/June 2010 statutory damages that total 5 TCPA violations (1 prerecorded call violates 227(b), 3 calls without CID and other identification violate 227(c), and 1 failure to provide a do-not-call policy violates 227(c)). That would be $7,500 in trebled TCPA damages. Liability for statutory damages also arises from respondeat superior; DONECIA AUGUSTUS was an agent/servant/employee of the corporate defendant acting within the scope of employment. She was a salesperson at the time, and salespeople must be attached to a broker (i.e., ALG; DONECIA AUGUSTUS was not a broker at the time) in an employment relationship. The broker is responsible for its salespeople and branch expenses; in order to avoid the illegal practice of "net branching", the broker must supervise its salespeople and pay the branch costs.[3]

For the prerecorded call in May 2010, it should also be subject to $16,000 in punitive damages.

Although the individual Defendants could have continued to do business with ALG during the five subsequent prerecorded calls to plaintiff, they may not have. As a real estate broker, DONECIA AUGUSTUS could have sold mortgages to any financial institution; she also could have handed them off to other brokers such as ALG.

Alternative 1 is to let ALG off the hook for the five subsequent prerecorded calls.

Alternative 2 is to make ALG liable for the five subsequent calls based on its admission by failing to answer.

Of course, the plaintiff wants Alternative 2: ALG should have defended.

---

[3] William C. Apgar, Assistant Secretary for Housing- Federal Housing Commissioner, http://www.nationwidelicensing.com/net_branching_fha.aspx , "...requires a HUD/FHA approved mortgagee to pay all of its operating expenses including the compensation of all employees of its main and branch offices."

Memorandum in support of Application for Default Judgment

## III.   <u>INJUNCTION</u>

Plaintiff requests that the individual Defendants should be permanently enjoined from violating the TCPA (47 U.S.C. § 227), the FCC regulations promulgated under the TCPA (47 C.F.R. § 64.1200 and 47 C.F.R. § 64.1601), California Business & Professions Code § 17500.3, and California Public Utilities Code §§ 2871-2876.

The individual Defendants still claim to be in the real estate business, and there is no indication that they have stopped using prerecorded calls.

Dated December 1, 2014

Gerald Roylance

11

1  Gerald L. Roylance
   1168 Blackfield Way
2  Mountain View, CA 94040-2305

3  Phone 1-650-948-1790

4  Pro se

5

6

7                    **United States District Court**
              **Northern District of California, San Jose Division**
8

9  GERALD ROYLANCE,                          Case No.: 14 CV 02445 PSG
              Plaintiff,
10        vs.                                DECLARATION OF GERALD ROYLANCE IN
                                             SUPPORT OF APPLICATION FOR DEFAULT
11 ALG REAL ESTATE SERVICES, INC. d/b/a      JUDGMENT
   AMERIFUND LENDING GROUP;
12 MARK AUGUSTUS;                            Judge: Hon. Paul S. Grewal
   DONECIA LA SHAUN AUGUSTUS;               Date: Tuesday, 6 January 2015
13 DOES 1-200                               Time: 10:00AM
              Defendants                    Courtroom: 5 (4th floor)
14
15 I, Gerald Roylance, declare as follows:

16     1. I am the Plaintiff in this action. I have personal knowledge of the facts in this declaration, and

17 if called as a witness, I could and would competently testify thereto.

18                        **IV.    DEFENDANTS**

19     2. As alleged in the complaint, ALG Real Estate Services, Inc. d/b/a Amerifund Lending Group is

20 a California corporation with entity number C2158079. The California Secretary of State's website

21 identifies the corporation's agent for service as Mark Fleischmann, 23734 Valencia Blvd Ste 206,

   Valencia, CA 91362. The California Department of Real Estate ("DRE") maintains a website that
22
   describes licensees; the DRE license ID is 01258835; the DRE website shows the corporation has done
23
   business as "Amerifund Lending Group" since 11 May 1999. It also does business as "RedBlue Realty"
24
   and "Stress Free Mortgage". On 2 June 2010, the DRE website showed that ALG REAL ESTATE
25
   SERVICES had 268 branches and 93 salespersons.

                                        1

3. Donecia La Shaun Augustus (La Shaun is sometimes spelled "Lashaun") is currently licensed with the California Department of Real Estate ("DRE"); her license number is 01236597. The DRE website shows she was licensed as a real estate salesperson 2 May 1998; she obtained a real estate broker's license 8 August 2010. Her former name was Donecia La Shaun Montgomery. DRE gives her main office as 15332 Antioch St Ste 516, Pacific Palisades, CA 90272. I investigated that address and determined that it is a private mailbox ("PMB") at UPS Store #1787. She is also the agent for service for another corporation, 1st Global Diversified, Inc. State corporation records for that entity also give her address as the Antioch St PMB address.

4. Mark Augustus registered the internet domain name expertonyourteam.com. The domain name registration gives Mark Augustus' address as 15332 Antioch St Ste 516, Pacific Palisades, CA 90272. The website gives the same address. I sent certified mail return receipt requested to Mark Augustus at the Antioch St address. The UPS Store signed for the certified mail.

5. Mark Augustus is also known as Mark A. Tolbert and Anthony Tolbert.[4]

6. I hired a registered process server, William Cohen, to serve the documents that were required for service: the Summons in a Civil Action; Order Setting Initial Case Management Conference and ADR Deadlines; Standing Order for Civil Practice in Cases Assigned for all Purposes to Magistrate Judge Paul S. Grewal; Settlement Conference Procedures; Standing Order Regarding Case Management in Civil Cases; Contents of Joint Case Management Statement; ECF Registration Information Handout; Welcome to the United States District Court for the Northern District of California, Clerk's Office, San Jose Division; Notice of Assignment of a Case to a United States Magistrate Judge for Trial; Consent to Proceed before a United States Magistrate Judge; Declination to Proceed before a Magistrate Judge and Request for Reassignment before a United States District Judge; and the complaint.

7. When he went to serve ALG Real Estate Services, Inc, the process server took a picture of the sign outside suite 206. The sign says "206", "Stress Free Mortgage", "Linda Fleischmann", and "Amerifund Lending Group".

8. I have not been contacted by Defendants' counsel pursuant to FRCP 26 or the standing Court order.

---

[4] http://www.veromi.net/summary.asp?from=kwVX00000000&vw=people&fn=Anthony&mn=Gresidenceoff&ln=Tolbert

Declaration of Gerald Roylance in support of Application for Default Judgment

### A. ALG Real Estate Services, Inc.

9.  Defendant ALG Real Estate Services, Inc. was served pursuant to Rule 4 of the Federal Rules of Civil Procedure on 17 July 2014 as evidenced by the proof of service on file with this Court. The person served at that address would not give her name. On 18 July, the process server then mailed the service documents to the Defendant at that address. Under California Code of Civil Procedure § 415.20(a), such service is complete 10 days after the mailing.

10.  Under Rule 12, Defendant ALG Real Estate Services, Inc. was required to plead or otherwise respond to the complaint by 18 August 2014 (21 days after service was complete). The time to plead or otherwise respond to the complaint has not been extended by any agreement of the parties or any order of the Court.

11.  Defendant ALG Real Estate Services, Inc. has failed to serve or file a pleading or otherwise respond to the complaint. The applicable time limit for responding to the complaint has expired.

12.  Defendant ALG Real Estate Services, Inc. is not a minor or an incompetent person.

### B. Mark Augustus

13.  Defendant Mark Augustus was served pursuant to Rule 4 of the Federal Rules of Civil Procedure on 18 July 2014 as evidenced by the proof of service on file with this Court. The process server then mailed the documents to the defendant at the same address. Under California Code of Civil Procedure § 415.20(b), such service is complete 10 days after the mailing.

14.  In addition, persons using private mailbox services in California must appoint the commercial mail receiving agency (CMRA) as an irrevocable agent for service pursuant to California Business and Professions Code § 17538.5. Within 5 days of being served, the CMRA must mail the documents to the defendant. Service is complete 10 days after that mailing. An answer would be due by 23 August 2014 at the latest.

15.  Under Rule 12, Defendant Mark Augustus was required to plead or otherwise respond to the complaint by 18 August 2014. The time to plead or otherwise respond to the complaint has not been extended by any agreement of the parties or any order of the Court.

16.  Defendant Mark Augustus has failed to serve or file a pleading or otherwise respond to the complaint. The applicable time limit for responding to the complaint has expired.

17.  Defendant Mark Augustus is not a minor or an incompetent person.

18. Defendant Mark Augustus is apparently not currently in the military service, and therefore the Servicemembers' Civil Relief Act does not apply. His LinkedIn profile does not show any military connection. He is a loan processor. Sources put his age at about 53 to 55, which would be beyond military age for most service members. Plaintiff does not know his SSN, so plaintiff could not search the service member database.

### C. Donecia La Shaun Augustus

19. Defendant Donecia La Shaun Augustus was served pursuant to Rule 4 of the Federal Rules of Civil Procedure on 18 July 2014 as evidenced by the proof of service on file with this Court. The process server then mailed the documents to the defendant at the same address. Under California Code of Civil Procedure § 415.20(b), such service is complete 10 days after the mailing.

20. In addition, persons using private mailbox services in California must appoint the commercial mail receiving agency (CMRA) as an irrevocable agent for service. California Business and Professions Code § 17538.5. Within 5 days of being served, the CMRA must mail the documents to the defendant. Service is complete 10 days after that mailing.

21. Under Rule 12, Defendant Donecia La Shaun Augustus was required to plead or otherwise respond to the complaint by 18 August 2014. The time to plead or otherwise respond to the complaint has not been extended by any agreement of the parties or any order of the Court.

22. Defendant Donecia La Shaun Augustus has failed to serve or file a pleading or otherwise respond to the complaint. The applicable time limit for responding to the complaint has expired.

23. Defendant Donecia La Shaun Augustus is not a minor or an incompetent person.

24. Defendant Donecia La Shaun Augustus is apparently not currently in the military service, and therefore the Servicemembers' Civil Relief Act does not apply. Her LinkedIn profile does not show any military connection. She is a real estate agent and broker. Sources put her age at about 44. Plaintiff does not know her SSN, so plaintiff could not search the service member database.

### D. 1st Global Diversified Inc. (not named as a Defendant)

25. This corporation was not named in the lawsuit and was not served.

26. None of the documents that I received identified 1st Global Diversified Inc.'s involvement in the prerecorded calls.

Declaration of Gerald Roylance in support of Application for Default Judgment

27. Mark Augustus has a LinkedIn page at http://www.linkedin.com/pub/mark-augustus/42/b14/310. On that page, he claims to be a "**Senior Loan Processor** at **First Global**" from January 2002 to the present. His education was at the University of Maryland.

28. Mark Augustus has another LinkedIn page at http://www.linkedin.com/pub/mark-augustus/10/922/908. On that page, he claims to be an "**Owner** at **First Global**".

29. I believe "First Global" means the California Corporation 1st Global Diversified Inc. The California Secretary of State lists DONECIA AUGUSTUS as the agent for service of that corporation (C3279426). The corporate address is the Antioch Street PMB. The corporation was filed 16 February 2010 (before the first prerecorded call); it is now listed as FTB suspended.

30. My internet searches for the telephone number 800-935-5914 turned up a link to (the slightly different name) 1st Global Diversified Financial Group, Inc. Websites say that company is a marketing firm, a marketing consulting firm, and a marketing/research real estate firm.[5] One website claims that DONECIA AUGUSTUS last updated the firm's data.[6] It claimed 10 to 19 employees with $0.5 to 1.0 million in annual revenue. The address is 8306 Wilshire Blvd Suite 7042, Beverly Hills, CA 90211. That address is a private mailbox at Beverley Hills Postal Center.

31. Although there was a 1st Global Diversified Financial Group, Inc. in Roseville, that now-dissolved corporation appears to be unrelated to the Defendants. It appears that DONECIA AUGUSTUS confuses that corporate name with 1st Global Diversified Inc.

32. The telephone number 800-935-5914 also ties to ALG REAL ESTATE SERVICES in documents that I received from MARK AUGUSTUS. I do not see a clear connection of 1st Global Diversified Inc. to the prerecorded calls. I think that link is likely, but I did not find any state record that shows 1st Global Diversified Inc. may write loans.

## V. <u>ENTRY OF DEFAULT</u>

33. Based on the failure to answer, I requested the Clerk enter the Defendants' default.

---

[5] http://1st-global-diversified-financial-group-inc.beverly-hills.ca.amfibi.com/us/c/7211424-1st-global-diversified-financial-group-inc

[6] http://www.manta.com/c/mm07fpq/1st-global-diversified-financial-group-inc?ftoggle-frontend-prod-on=abTests.engagement.responsive_20141009_control&utm_expid=82789632-21.i-w9zu_KTTaAx03OJeHK9w.1&utm_referrer=http%3A%2F%2Fwww.google.com%2Furl%3Furl%3Dhttp%3A%2F%2Fwww.manta.com%2Fc%2Fmm07fpq%2F1st-global-diversified-financial-group-inc%26rct%3Dj%26frm%3D1%26q%3D%26esrc%3Ds%26sa%3DU%26ei%3DDA-9GVLXxPMKivASEp4C4Aw%26ved%3D0CBQQFjAA%26sig2%3DHRYMxbFEI08y8yMWSHbU0w%26usg%3DAFQjCNF68eOsw5WB27a648SAFNlq5g5i1Q

Declaration of Gerald Roylance in support of Application for Default Judgment

34. That request was served by mail on each of the Defendants. ALG REAL ESTATE SERVICES, INC. was served through Mark Fleischmann, its statutory agent, at the address provided by the Secretary of State's business information website. MARK AUGUSTUS was served at PMB 516, which is the address he gives on his website and its domain registration. DONECIA LA SHAUN AUGUSTUS was served at PO Box 35664, Los Angeles, CA. That is the address on her Department of Real Estate license information.

35. On May 28, 2014, I had filed a Request for Change of Address or Boxholder Information Needed for Service of Legal Process with the Los Angeles Postmaster. On June 26, 2014, the Post Office finally replied, but it did not provide the boxholder's address, but rather just stated the PO Box was still a good address. I do not know the address behind the PO Box.

36. The Clerk entered the Defendants defaults on 15 September 2014.

## VI.   CONTACT

37. I have received no contacts from any Defendant about this case.

38. There is a related matter that I discovered while working on the complaint. In addition to the prerecorded calls described in the complaint, there are later prerecorded calls and live calls in 2011. These 2011 prerecorded calls were in the same voice as the calls in this complaint, but they offered a 3.75 percent mortgage rate and ultimately involved C2 Financial Corporation rather than ALG REAL ESTATE SERVICES, INC. The person I spoke with after one call was "Mark Anthony", and he gave his telephone number as 1-800-935-5941 (compare to MARK AUGUSTUS and 1-800-935-5914). I believe Mark A. Augustus is Mark Anthony Augustus. Furthermore, DONECIA AUGUSTUS was associated with C2 Financial Corporation at that time. Caller ID was suppressed on all calls.

39. Consequently, on 29 May 2014 I wrote a CLRA demand letter to David Temko of C2 Financial Corporation and MARK AUGUSTUS about the 2011 calls. The green cards were signed on 4 June and 31 May respectively.

40. MARK AUGUSTUS never responded to the demand letter.

41. On 23 June 2014, attorney Noelle Pepper responded on behalf of C2 Financial Corporation. She did not say that she represented either Mark or Donecia Augustus. C2 denied employing Mark Anthony or Mark Augustus. The letter also speciously claimed that C2 Mortgage "is not our company"; the DRE website shows that C2 Financial Corporation has a d/b/a of "C2 Mortgage". C2 admitted that DONECIA AUGUSTUS originated loans for C2, but claimed she was an independent contractor. The

6

letter included a printout from NMLS Consumer Access that stated "Donecia Lashaun Augustus" uses a telephone number of 800-935-5914 and is "Authorized to Represent: C2 Financial Corporation". The letter included a copy of the C2 Financial Corporation do-not-call policy (DNCP). C2 did not offer me a remedy in this letter.

42. I examined the self-reported employment history for Ms. Augustus' NMS record. The record states that from May 2008 until June 2010, her employer was AMERIFUND (i.e., ALG REAL ESTATE SERVICES, INC.). Between May 2010 and November 2011, she was self-employed as a real estate broker. From November 2011 to the present, she was employed by C2 Financial. A true and correct copy of NMLS record is given as Exhibit B.

43. The certified letter had demanded a DNCP. C2 Mortgage's DNCP is both confused and wrong on many points, but it requires loan originators to get approval for any telemarketing: "You must then provide a copy of your telemarketing piece for approval in accordance with the advertising policy. Failure to obtain approval prior to dissemination will result in disciplinary action." C2 has the right to control its loan originators' telemarketing. That right shows an agency relationship.

44. On 3 July I replied to Ms. Pepper by letter.

45. On 28 July (2 months after the initial demand), Ms. Pepper responded. I appreciated some features of her reply, but it was still inadequate in other respects. I called Ms. Pepper on 7 and 8 August, but I did not reach her and did not leave voicemail.

46. On 27 August, I saw that http://www.expertonyourteam.com (MARK AUGUSTUS' website) was still claiming to be C2 Financial Corporation at 15332 Antioch St. Ste 516, Pacific Palisades.

47. I looked at the website again on 16 October 2014, and the home page still says C2 Financial Corporation and "Donecia L. Augustus CA BRE #01236597 NMLS #349776".

48. I called Ms. Pepper again on 16 October, but did not reach her. I left voicemail. We have not spoken.

49. The Complaint's allegations do not cover the 2011 prerecorded calls on behalf of C2 Financial Corporation.

## VII.   BACKGROUND

50. I have received many prerecorded calls over the years. I learned that those calls violate state and federal law. Many telephone subscribers know about the National Do-Not-Call Registry (the

Declaration of Gerald Roylance in support of Application for Default Judgment

1   national do-not-call list), but few subscribers know about the prohibitions against automated calls to fax

2   machines, cellular telephones, and residential telephones.

3        51.   I have taken many telemarketers to small claims court. I have also pursued some telemarketers

    in higher divisions of state court and in federal court.

4

5        **A. Federal Communications Commission**

6        52.   I participate in the Federal Communications Commission's requests about TCPA rulemaking

7   and petitions. I have submitted many comments on the FCC docket; the system is known as the

    Electronic Comment Filing System (ECFS).

8        53.   Although automated calls and especially telemarketing calls are a major nuisance, the FCC has

9   done little to stop the problem. The FCC receives many consumer complaints, but it issues few citations

    and even fewer forfeitures. The FCC has a list of its enforcement actions at

10  http://transition.fcc.gov/eb/tcd/eabydate.html.

11       54.   FCC enforcement activity has been criticized by the General Accounting Office (GAO). In

12  2005, the FCC received 46,000 junk fax complaints (one type of automated call prohibited by the

13  TCPA). Between 2000 and 2005, the FCC issued only 261 TCPA citations (a citation is just a warning)

    and only six TCPA forfeiture orders. The forfeiture orders totaled $6.9 million dollars, but the FCC did

14  not collect any of them. See http://www.gao.gov/products/gao-06-425.

15       55.   In a February 2008 report, the GAO still was not satisfied. See "FCC Has Made Some

16  Progress in the Management of Its Enforcement Program but Faces Limitations, and Additional Actions

17  Are Needed", http://www.gao.gov/new.items/d08125.pdf. The GAO wondered why the FCC closed

18  83% of the consumer complaints without any action. That report says, "Specifically, FCC has not set

    measurable enforcement goals, developed a well-defined enforcement strategy, or established

19  performance measures that are linked to the enforcement goals. Without key management tools, FCC

20  may have difficulty assuring Congress and other stakeholders that it is meeting its enforcement

21  mission." In 2003 to 2006, the FCC received 178,079 TCPA complaints. (Report page 17.) The

    Enforcement Bureau addressed 4,135 junk fax cases; it closed 3,942 of those cases without taking any

22  action; it issued 192 citations (i.e., the FCC sent a certified letter); there was only 1 monetary forfeiture.

23  The GAO discovered that the FCC did not have any performance measures or goals for junk fax

24  monitoring in 2006. (Report page 30.)

25       56.   I have filed many TCPA telemarketing complaints with the FCC. The effort seems to be futile,

    so I seldom file them now. Some of my complaints have been rejected because one of the FCC

employees reading the complaints did not understand the law. Such a result seems surprising because the FCC complaint form consists of check boxes; the FCC's software should be able to determine if there was a violation from the check boxes.

57. The Federal Trade Commission seems to be much more effective at enforcement of telemarketing laws or at least using the threat of telemarketing violations to encourage settlements for other offenses.[7] The FTC has also sponsored contests to catch notorious robocallers such as "Rachel with Cardholder Services".

### B. Kinds of calls

58. I have seen differing characteristics in prerecorded calls. Over time, prerecorded call advertisers have become more skilled at hiding their identities. Hiding identity often appears to be an effort to avoid prosecution.

59. I tend to lump violators into different groups.

60. There are naïve violators who don't know prerecorded calls are illegal. These callers are typically small local companies. The prerecorded call may identify the company, and the Caller ID will be accurate. These violators think what they are doing is legal, and they do not deliberately hide their identities.

61. For example, I've received calls from local chiropractors and dentists who have been deliberately misled by dishonest equipment vendors. A Texas company, for example, sold robocalling equipment (at exorbitant prices) to local companies as a marketing tool. The contract's fine print, however, warned the purchasers that they should check the statutes to see if automated telemarketing was legal (it is illegal throughout the US); there was also a disclaimer of liability. The systems included some example prerecorded messages for soliciting business. Those who purchased the systems often used these professionally-produced example messages (which would be anonymous only because they were generic), but these chiropractors and dentists would readily identify the business during the live callbacks.

62. When told about the TCPA's prohibitions, they would express surprise that the calls were illegal. When small, local, business owners find out the calls are illegal, they usually stop. They're basically honest people who did not know the law.

---

[7] "Service-contract robo-caller will pay $2.3 million to settle FTC suit", 23 August 2010, Matthew Hathaway, St. Louis Post-Dispatch, http://www.stltoday.com/business/columns/savvy-consumer/service-contract-robo-caller-will-pay-million-to-settle-ftc/article_cbf76678-aeeb-11df-b812-00127992bc8b.html

Declaration of Gerald Roylance in support of Application for Default Judgment

63. That's not always the case; sometimes they realize that automated calls can make a lot of money, so they want to keep doing it. A couple small claims defendants have asked me how they could change the prerecorded message so it would be legal. Illegal prerecords are attractive because the calls are inexpensive, require little labor, and are effective advertising.

64. There are also businesses that are misled by marketing companies. Instead doing its own telemarketing, a company may hire a marketing firm that will find leads on its behalf. In many ways, using an outside firm with its special expertise can be a smart move. Unfortunately, some of those marketing firms might be using illegal prerecorded calls. I've received prerecorded calls, complained to the seller, and then been shown contracts that expressly forbid using prerecorded calls. The marketing company used prerecorded calls anyway.

65. Larger prerecorded telemarketing campaigns often try to game an FCC exemption. The FCC permits automated survey calls if they are not solicitations, so several companies have employed "information-only" calls or survey calls as a ruse. An information-only call avoids making an explicit offer, but the offer is often implied or follows quickly. A mortgage business might make prerecorded calls announcing that mortgage rates had fallen and telling the recipient to press 1 for more information. Pressing 1 would connect the recipient to a mortgage company that wanted to refinance the recipient's mortgage. The purpose of the prerecorded call was not information but rather selling.

66. The FCC also permits some automated survey calls. P&M Consulting, for example, used a prerecorded marketing survey format to determine if the called person was eligible for a complimentary vacation package. The complimentary vacation package was really a 90-minute timeshare sales presentation. The purpose of the call was not a marketing survey but rather part of a sales campaign. See *Marguilis v. P & M Consulting, 121 S.W.3d 246* (MO Court of Appeals, ED 2003).

67. In 2003, an FCC Order made clear that prerecorded calls that were part of a sales campaign were forbidden even if no offer of goods or services was made during the prerecorded call. FCC Report and Order, 3 July 2003, FCC 03-153, 68 F.R. 44144 ¶¶ 139-142.

68. The survey ruse lives on. I've received prerecorded survey calls from a cruise ship line. The call will offer a free cruise in exchange for answering a few innocuous (and irrelevant) political survey questions. After answering the questions, I'm transferred to the cruise line, which promptly identifies itself. It turns out the cruise is not "free"; there are port charges of about $100; there may also be a required sales presentation. The automated survey call is a sham for selling cruises and vacation packages.

10

69. The FCC also permits prerecorded calls from tax-exempt nonprofits, so there are a variety of calls that claim to be from nonprofits (real or otherwise). The nonprofits may end up being agents of for-profit enterprises. The Dove Foundation claimed to be a pro-family nonprofit that promotes cleaner, family-friendly, entertainment; the real purpose of its prerecorded calls was to advertise the products of a related Utah for-profit company, Feature Films for Families.

### C. Hiding identity

70. Some phony nonprofits go to great lengths to hide their principal. I've received several calls from an organization claiming to be the non-profit Health Product Assistance for Seniors (HPAS). The organization claimed to help seniors get a new diabetic testing meter. This calling campaign is very sophisticated, and I must pass several hurdles (such as stating that I placed the call) before I can identify the organization behind the calls. The real purpose of the call is finding Medicare patients and signing them up with a for-profit medical supply house.

71. The effort spent at hiding the caller's identity is a clear indicator that the caller knows that the calls are illegal. Honest advertisers do not hide their identity. Part of advertising is name recognition. Illegal advertisers do not want to get sued, so they will hide their identity.

72. Identities are hidden by the caller not giving any name (staying anonymous) or giving a phony name. Callers often refuse to provide a telephone number until after I make a purchase. I've asked if callers have a website, and I will get a variety of answers. Sometimes, the company is working on a website but it is not up yet; sometimes the website is bogus; if the website is real, then it may have an anonymous proxy registration (e.g., Domains By Proxy, Inc.) or a foreign registration (e.g., Panama, Philippines, or Egypt). Some websites even have anonymous foreign registrations. A legitimate seller would not go to such great lengths to make it difficult to find them.

73. Identities are also hidden by using burner cellular phones, blocking Caller ID altogether (telemarketers are prohibited from blocking Caller ID), by using nonexistent area codes or exchanges, or even spoofing some innocent person's Caller ID. Sometimes bogus Caller ID numbers have "411" (information) or "911" (emergency) exchanges. People making such calls had to take deliberate steps to cause such bogus Caller ID to be sent on the Public Switched Telephone Network (PSTN); it cannot be an accidental occurance.

74. Often times, the only way to identify the caller is to make an appointment for a home-improvement estimate (such as an alarm system installation) or purchase the merchandise. I've received many calls for medical monitoring equipment that helps people who have "fallen and can't get up". The

11

company behind these calls is not immediately clear from the call because some generic-sounding entity name is used, but when I order the equipment, the equipment comes from the New York company LifeWatch. LifeWatch has been sued by several people, including the Indiana Attorney General, but I continue to get LifeWatch calls long after the suit.[8] The FTC and the Florida Attorney General have gone after some of LifeWatch's underlying telemarketers.[9]

75. Even when I express interest in or purchase a product, the caller may not give out his true identity. The credit card charge may be done under a fictitious business name or a third party; the charge information may not include a telephone number.

76. Perhaps the most sophisticated at hiding its identity are the "Rachel from Cardholder Services" calls (apparently several entities are running this scam). Rachel claims to be able to lower interest rates on credit card debt. Rachel won't give out her identity until after the recipient provides a credit card number and the 800-number on the back of the card. Rachel then calls the 800 number, tells the bank the account number, asks for the credit card balance (to see if the debt several thousand dollars), and checks the credit card limit (to see if Rachel can make her charge). The FTC has run contests for ways to catch Rachel.

### D. Breadth of calls

77. One can judge the magnitude of a calling campaign.

78. If the caller is a local business, then the calling campaign is probably local. That also fits with the type of business: chiropractors, dentists, and landscapers need local clients; far-away clients do not make sense.

79. If the caller is from Southern California and calling into Northern California, then the campaign is probably at least statewide. I have received many calls from Southern California about, for example, loan modifications.

80. Calls from out of state imply large calling campaigns with a national scope. I've received medical alarm calls that lead back to New York. I've received burglar alarm calls from Utah. I've received vacation package calls from Florida. These suggest calling campaigns that involve millions of calls throughout the United States.

---

[8] http://kstp.com/kstpImages/repository/cs/files/Safeline%20Amended%20Complaint.pdf
[9] http://www.ftc.gov/news-events/press-releases/2014/01/ftc-florida-attorney-general-sue-halt-operation-used-robocalls

81. The size of the campaign also suggests sophistication. The bigger the operation, the more sophisticated the caller. Someone who makes millions of calls has probably learned that the calls are illegal from an irate consumer and taken some steps to avoid prosecution.

### E. Call value

82. Selling requires good leads, so good leads are valuable. The value of a lead is well illustrated by timeshare sales – an area that was plagued with robocalls several years back. I have sued timeshare companies. The profit margin on timeshares was high, so timeshare companies were willing to pay a lot to get a couple to show up at a 90-minute timeshare presentation. Somebody must beat the bushes to find people who show up at the presentations. Instead of doing it themselves, some timeshare companies would hire a lead generator/telemarketer to make the telephone calls. I've seen a few telemarketing contracts, and paying the telemarketer $150 to $300 for each couple that attends a sales presentation was common.

83. As it turns out, the timeshare company would sell a timeshare to about one out of every ten couples that showed up. That meant that the timeshare company spent $1,500 to $3,000 in lead costs for each sale. In addition, the timeshare company (not the telemarketer) paid for the "premium", a gift that is given to the couple to entice them to show up. The gift might be a trip to Las Vegas.

84. Finding leads is significant work. It turns out that a telemarketer would have to spend about four hours making calls before finding someone who would show up at the timeshare presentation. The lead generator would pay rent, telephone charges, and labor. That's a lot of work, but the lead generator can pay his employee/telemarketer and make a little money. But there's another hitch here: in order to make effective calls, the lead generator needs to rent calling lists from other vendors. It's a waste of time for a telemarketer to call someone who does not fit the required demographic. The timeshare companies only offer tours to those who are between certain ages and have significant household incomes. The legitimate lead generator will rent such a list rather than place calls to unqualified candidates. All of these expenses impact the lead generator's profit. The timeshare companies know about these costs, and that's why they will pay a lot to get a couple to show up.

85. A dishonest lead generator can take a different view. Instead of paying a person to make legal calls, the lead generator can have a cheap computer make the calls. The lead generator doesn't even need to own the computer; there are plenty of web-based voice blasters out there. Googling will turn up many companies. CallFire (a company that I came across on the FCC Docket), sells 20,000 minutes for

13

$600 (3 cents per minute);[10] other companies are cheaper. The incremental labor cost essentially goes to zero; machines (not people) are making the calls for essentially communications charges. Neither does the lead generator have to pay for demographic lists; the calls are cheap enough that making extra calls is not a problem. In the *P & M Consulting* case above, the robocall asked the demographic questions as part of the script rather than buying an appropriate list. The timeshare lead generator would break even if those 20,000 minutes worth of automated calls turned up just 4 couples at a timeshare presentation (giving $600 in commissions).

86. I don't know how effective automated calls are at getting leads for timeshare companies. I do know several lead generating companies used prerecorded calls to contact me. The timeshare companies were not very good at vetting their lead generators. One timeshare company hired an outfit whose address was a PMB in Florida; the company had two employees, and only one of those employees spoke to potential leads. The company could not make many live calls with only one employee.

### F. Mortgage leads

87. I have seen material about mortgage leads. Different kinds of mortgage leads have different values. A "stale" (old) lead is worth less than a "fresh" (new) lead. Old leads imply a lot of calling (and labor) with little chance of success. A shared lead costs less than an exclusive lead. A fresh and exclusive mortgage lead can be $100. (http://blogs.alamode.com/mortgage/article/eight-things-to-consider-when-buying-mortgage-leads "Eight Things to Consider when Buying Mortgage Leads", 8 July 2014. Old leads are $2 each but have a lousy closing rate. Fresh leads are $10 to $20. Exclusive leads cost twice as much.) (http://www.trulia.com/blog/julieellefson/2013/05/buying_mortgage_leads_tips_for_loan_officers "Buying Mortgage Leads: Tips for Loan Officers", 23 May 2013. Mortgage leads are $125 to $150.)

88. The company Fax.Com, Inc. started out sending illegal junk faxes, but later it did prerecorded calls. The California Attorney General sued Fax.Com, and some discovery documents were stored in a Southern California warehouse.

89. One of the Fax.Com's customers was the subprime mortgage company Optima Funding, Inc. Optima Funding started from nothing and in several months had sold a quarter billion dollars worth of mortgages. Its success came from illegal telemarketing. Optima Funding was sued dozens of times in

---

Santa Clara County small claims court, so Optima knew prerecorded calls were illegal, but it kept making prerecorded calls.

90. Some acquaintances and I sued Optima Funding, and one of those acquaintances got some copies of the Fax.Com discovery obtained by the Attorney General. Fax.Com invoices showed that Optima Funding was paying $6 for each hot transfer mortgage lead. Six dollars is a lot cheaper than paying a legitimate source $100 for a hot mortgage lead. The inexpensive leads fueled Optima Funding's sales.

91. The economics for making prerecorded mortgage calls are also more attractive because the value of a mortgage is so much larger. For example, if the caller stands to make $1,200 for a loan origination fee, then buying 20,000 minutes of prerecorded calls for $600 can make sense. If those 20,000 minutes produce only one mortgage origination fee, then the caller has doubled his investment. There's little work involved: the machine does all the dull calling; it finds the people who want a loan now (a hot lead); the rest is a callback and some paperwork.

92. If we look at Fax.Com's lead pricing ($6/lead), $600 worth of robocalls (Fax.com's cost to do the robocalling at CallFire prices) would have to produce more than 100 leads (what Optima Funding would pay for the leads) for Fax.com to break even.

### G. Risk of getting sued

93. The other sad reality of prerecorded telemarketing is that the risk of being sued is vanishingly small. It's almost insignificant, and the cost of such a suit can be viewed as a small cost of doing business. I suspect that most illegal telemarketers are never sued.

94. When I sued a Utah telemarketer, he told me that his robocaller knew the calls were illegal, but the robocaller claimed that almost nobody sued – and when they did nothing came of it.

95. TCPA statutory damages at $500 trebled to $1500 seem significant at first blush, and they can be a significant deterrent to a small business. Once stung, you'd expect the small business to stop, but even some small businesses figure out that it is economical to continue making illegal calls. I got a prerecorded call about burial insurance around 2007. I identified the seller, and I sent a demand letter. He gave me a story about not knowing the calls were illegal, and we reached a settlement of $1500. I thought he would stop, but other people have complained of getting burial insurance prerecorded calls from him in 2008 and 2009.

96. I sued California resident Thad Sipple in small claims court a long time ago for making prerecorded calls selling legal insurance. He apparently has not stopped using prerecorded calls. His

Declaration of Gerald Roylance in support of Application for Default Judgment

1   name appears in postings discussing insurance leads and automated telemarketing.[11][12]  A Google search

2   turns up that Mark Fitzhenry filed a TCPA lawsuit against Thad Sipple in South Carolina District Court

3   (case number 2:2014cv03690) on 18 September 2014.[13]  The complaint alleges the voice in the

4   prerecorded calls is Thad Sipple's.[14]  The complaint also alleges the prerecorded message was: "Hello,

    this is a benefit information update regarding a new state-approved funeral insurance program that is

5   now available in your state. The state-approved and state-regulated funeral insurance program will pay

6   up to $35,000 tax-free for your burial and final expenses with no health questions and no waiting period.

7   To receive this information, please press the 1 key on your phone now. To be added to our no-calls list,

    press 9 now, but for more information, please press the 1 key now."  Mr. Sipple should know better.

8       97.  Another poster on the bulletin board, "bobsmktg," pointed out the unlikelihood of getting sued

9   for telemarketing: "You guys (and ladies) are smart enough to know that millions of business owners

10  who will not comply will not be sued. Not even hundreds of thousands. Not even tens of thousands. Not

    even thousands. Hundreds? Maybe. Do you really think Your Friendly Neighborhood Agent is a priority

11  for this law?"[15]  He also pointed out that millions of people used Napster, but very few users were sued

12  by RIAA.  He also thinks the TCPA does not apply to him but rather scammers from overseas: "Let's

13  keep in mind what kind of calls and this law was designed to stop - it's not designed to stop us, it's

14  designed to stop robo-calling scammers overseas."

15      98.  I disagree with bobsmktg's interpretation of the TCPA, but his comments about few people

16  being sued are correct.

17      99.  Over the years, I've looked for ways to estimate the probability of someone suing after

    receiving a TCPA violation.  That probability has to be small; if it were not small, then the violations

18  would not be economic and violators would not continue to use prerecorded calls.

19      100.  There's a straightforward number in *United Artists Theatre Circuit, Inc. v. FCC*, 147 F.Supp.2d

20  965 (AZ 2000).  In 1999, United Artists hired American Blast Fax, Inc. to send out 90,000 one-page

21  faxes to businesses in the Phoenix area.  The fax offered discount movie tickets.  Out of the 90,000

    faxes, 179 businesses (0.2 percent) bought discount tickets, 89,820 businesses ignored the fax, and one

22  company (ESI Ergonomic Solutions, Inc.) sued for the TCPA fax violation.  (147 F.Supp.2d at 969.)

23

24

25

11 http://topic-finder.com/insurance/leads/36826-anybody-ever-use-press-1-leads.html
12 http://topic-finder.com/insurance/leads/36611-predictive-dialers.html
13 http://dockets.justia.com/docket/south-carolina/scdce/2:2014cv03690/215468
14 http://www.carolinasclassaction.com/wp-content/uploads/2014/09/Fitzhenry-v.-Indep.-Order-of-Foresters-Complaint.pdf
15 http://topic-finder.com/insurance/cold-calling/36068-new-tcpa-rules-for-oct-16-2013-telemarketing.2.html

Declaration of Gerald Roylance in support of Application for Default Judgment

101.  The simple view is that only 1 person in 90,000 will file a TCPA lawsuit.  The data is not very good; it would be better if the sample size was much larger and that more recipients filed suit.  It also has a sampling bias because we know that in this sample someone did file suit.  The filing risk might be much smaller.  There were probably many similar-sized fax campaigns that resulted in no lawsuits; those campaigns are not reflected in the statistic.  I believe 1 in 90,000 overstates the litigation rate, but it is a simple number to use.  The bias would weigh in favor of the defendant.

102.  Another viewpoint is one of cost.  A fax broadcaster may charge 3 cents per fax for 90,000 faxes.[16]  The bill would be $2,700.  Any business model would have problem if there were a $1,500 small claims lawsuit for every $2,700 in sales.  Realistically, the litigation risk must be much less to sustain the business.  (American Blast Fax's subsequent history is interesting.  The company was sued, but it continued to broadcast illegal faxes because it was profitable:  "To be clear, the Court finds Greg and Michael Horne were the "guiding spirits" and the "central figures" behind the TCPA violations. They were the two persons who controlled all of Blastfax's day-to-day operations. They both had direct, personal involvement in and ultimate control over every aspect of Blastfax's wrongful conduct that violated the TCPA, and/or directly controlled and authorized this conduct. And they did so with their eyes and pocketbooks wide open. After October 5, 2000, Greg and Michael Horne had good reason to believe they were running a business that violated the TCPA. On February 9, 2001, they knew they were. Yet they continued to direct their company to send unsolicited intrastate fax advertisements." *Texas v. American Blast Fax*, (2001 WD Texas) 164 F.Supp.2d 892 @ 898.  American Blast Fax was sending 2.5 million faxes per month.  164 F.Supp.2d 900.)

103.  A fax solicitation must have some reasonable identity information in it.  A faxed solicitation would be worthless if the fax did not have a way to contact the seller.  That contact information makes it more difficult for an illegal fax advertiser to hide.

104.  The situation is different for a prerecorded call advertisement.  The prerecorded message need not give out any identity information.  It need only ask if the recipient is interested in having his carpets cleaned or lowering his mortgage interest rate or what-have-you.  The prerecorded caller can hide his identity until the recipient makes the credit card transaction or writes a check.

105.  Prerecorded calls can substantially reduces the risk of a lawsuit over that of a fax campaign (which was used for the 1 in 90,000 figure).  If the recipient does not know who the caller is, then the recipient cannot file suit.

---

[16] http://www.b2bfax.net/faxBroadcastPrices.html is 3 cents per fax page for 20,000 or more.

Declaration of Gerald Roylance in support of Application for Default Judgment

106. I receive many prerecorded solicitations, and the majority of those solicitations are anonymous. If I press a key and ultimately speak with a real person, that person may not provide solid identity information either. Sometimes the person gives the real company name, but often not. If I complain about the prerecorded call, the caller often hangs up, so I have little information.

107. I get lots of illegal prerecorded calls, but I don't sue them all. I don't know who some of the callers are. I don't bother with others.

108. All of that means an anonymous robocaller has very little risk of being sued – less than the 1 in 90,000 number from the *United Artists* fax suit. I suspect the probability is much less than 1 in 1 million, but I will continue to use the 1 in 90,000 number.

### H. Cost of suit

109. TCPA statutory damages are $500 with a possible trebling to $1500. For every 90,000 calls a robocaller makes, he might see one recipient complain about a TCPA violation. The robocaller could pay that claim and view it as the cost of doing business. Although the TCPA damages may look steep on a per call basis, paying one claim for every 90,000 calls is cheap: $500 / 90,000 is $0.0056 (less than half a cent per call); even trebled, the cost is less than 2 cents per call.

110. The litigation cost can be viewed as 2 cents per call. (If the lawsuit probability was 1 in one million calls, the litigation cost would be less than 0.2 centers per call.) Such a small cost does not create a substantial disincentive.

111. That litigation risk should be compared to the labor costs of using legal telemarketing with live people. The Bureau of Labor Statistics puts the median telemarketer wage at $10.87 per hour. (http://www.bls.gov/OES/current/oes419041.htm) If the average telemarketing call lasts 1 minute (the time to speak about 120 words), then the direct labor cost for that call would be $10.87/60 = $0.18 per call. (In addition, there would be other costs for maintaining a large telemarketing staff.)

112. Sadly, it is economic to violate the TCPA with prerecorded calls and payoff the occasional suit rather than to do legal telemarketing and pay wages.

113. Class actions offer substantially different economics than the above, but until recently, TCPA class actions have been rare. Even now, the targets of class actions must usually have deep pockets. Businesses without deep pockets are relatively immune. Although Thad Sipple is named in a class action suit above, the deep pockets belong to an insurance company.

18

# VIII. <u>FACTS</u>

114.  The Complaint provides detailed allegations about the calls at issue.  Defendants have failed to respond and hence have admitted those allegations.  Here, I only wish to add some further details.

115.  I have Caller ID.  The Caller ID display shows the caller's name (as determined by the telephone company's database lookup), the caller's telephone number (which may be blocked or spoofed), and the date/time of the call.

116.  When I answer a telephone call where I don't recognize the caller, I will usually make notes of that call on a piece of paper.  I will date stamp the paper with my Dymo Datemark.  It records the date and time.

117.  I will record some calls using the "memo" feature of my Panasonic telephone.  When I record the calls, the telephone emits a beep every 15 seconds.  The calls are recorded on a microcassette.  At the time, when my answering machine takes a call, it also recorded the call on the microcassette.

118.  When a call finishes, I will copy the Caller ID information to the paper.  I file the papers chronologically.  I also create an index of the calls on my computer.

119.  At some later date (perhaps long after the microcassette has been removed from the answering machine), I will index the microcassette.  While indexing the tape, I will transcribe many of the prerecorded portions of the call.  Consequently, I will be able to search the tape index for distinctive phrases.  I try to be careful with my transcriptions, but they are not exact.  The transcriptions may contain spelling variations ("4" vs. "four"), spelling mistakes, and slight errors ("that's" vs. "that has").

## A. The first call

120.  The first anonymous prerecorded call was on 28 May 2010.  The Caller ID information was blocked ("Private caller" with no telephone number displayed).

121.  My transcript of this message is (T71B072):

> ... thirty year loan at an incredible interest rate of four point five percent.  If you'd like more information about this program, press one on your phone right now.  Are you in an adjustable rate loan that's already started to adjust or is going to adjust in the next twelve to twenty-four months?  If so, take advantage of an incredible interest rate of four point five percent fixed for your thirty year mortgage and skip two payments.
> [Press 1.]
> At the tone, state your name, your telephone number, and a convenient time to reach you there, and we'll be back in touch.

122. In order to identify the caller, I pressed a key. At that point, I had to leave the requested information or I would not get any identity information.

123. MARK AUGUSTUS called back a short time later; it was a live call. The Caller ID for his call was also blocked.

124. MARK AUGUSTUS said he was with "American Home Lenders" at 800-935-5914. I claimed I had a $270,000 30-year mortgage at 7.5% fixed. He would send me a loan package.

125. MARK AUGUSTUS called again on 1 June; he asked a question he needed for the application. The Caller ID information for this call was also blocked.

126. The loan package arrived via On Trac, an express company. The tracking number is D10010289923900. The shipper was "AMERIFUND LENDING".

127. Inside was a letter that identified MARK AUGUSTUS. It gave his email address as Mark@ExpertOnYourTeam.com.

128. The loan documents were for 4.5% fixed rate for 30 years.

129. The loan package included a "Mortgage Loan Disclosure Statement / Good Faith Estimate". That document included a line item of "Lender's Loan Origination Fee" of $1200. My interpretation of that fee is that it would go to DONECIA AUGUSTUS; she is listed on the document as the "loan originator". I presume she would share that fee with MARK AUGUSTUS.

130. The broker, ALG REAL ESTATE SERVICES, INC., would make its money from the lender based on the interest rate differential. The prime rate has been 3.25 percent since 16 December 2008.[17]

### B. Demand letter

131. After receiving the loan package, I could identify the actors. I wrote a demand letter and sent it to both MARK AUGUSTUS and ALG REAL ESTATE SERVICES, INC.

132. Exhibit A is a true and correct copy of the demand letter.

133. The demand letter included a do-not-call request.

134. Defendants now had actual notice that prerecorded calls were illegal.

135. I received no response to the demand letters.

### C. Subsequent calls

136. When I looked at this case in 2014, I only remembered one prerecorded call, the one in late May. The transcript for that call had some specific phrases such "incredible interest rate", "skip two

---

[17] http://www.fedprimerate.com/wall_street_journal_prime_rate_history.htm

Declaration of Gerald Roylance in support of Application for Default Judgment

payments", "already started to adjust", and "lock up your fixed". I searched my transcripts for such phrases, and I uncovered the five subsequent identical calls mentioned in the Complaint. I listened to the calls, and they were in the same voice as the first call. The calls were identical.

137. The five subsequent prerecorded calls in the Complaint were in October and November 2010, several months after the May prerecorded call. The dates were 1 October, 22 October, 3 November, 3 November, and 28 November. The Caller ID information for these calls was also blocked.

138. My transcript for the 1 October 2010 call (T72B108):

> … incredible interest rate of 4 point 5 percent. If you'd like more information about this program, press one on your phone right now. Are you in an adjustable rate loan that has already started to adjust or is going to adjust in the next twelve to 24 months? If so, take advantage of an incredible interest rate of 4 point 5 percent fixed for your 30 year mortgage and skip two payments. Would you like to tie up all of your debts in one first mortgage that will allow you to take advantage of a fixed interest rate of 4 point 5 percent for 30 years? Once again, if you'd like additional information about this program available to you, and skip two payments, press the one key on your telephone. If you'd like to be placed on the do-not-call list, press nine. But press one to hear more.

139. My transcript for the 22 October 2010 call (T72B253):

> … offer of a 30 year fixed rate mortgage at 4 point 5 percent. That's right, lock up your fixed 30 year loan at an incredible interest rate of 4 point 5 percent. If you'd like more information about this program, press one on your phone right now. Are you in an adjustable rate loan that's already started to adjust or is going to adjust in the next 12 to 24 months? If so, take advantage of an incredible interest rate of 4 point 5 percent fixed for your 30 year mortgage. And skip two payments. Would you like to tie up all of your debts in one first mortgage that will allow you to take advantage of a fixed interest rate of 4 point 5 percent for thirty years? Once again, if you'd like additional information about this program available to you, and skip two payments, press the one key on your telephone. If you'd like to be placed on the do-not-call list, press nine. …
> [Press one]
> At the tone, please state your name, your telephone number, and a convenient time to reach you there, and we'll be back in touch.

140. I screened (listened to the call go to my answering machine) but did not pick up the handset for the next prerecorded call. My transcript for the 3 November 2010 (11:24AM) call (T73A076):

> … incredible interest rate of 4 point 5 percent. If you'd like more information about this program press one on your phone right now. Are you in an adjustable rate loan that has already started to adjust or is going to adjust in the next 12 to 24 months? If so, take advantage of an incredible interest rate of 4 point 5 percent fixed for your 30 year mortgage and skip two payments. Would you like to tie up all of your debts in one first mortgage that will allow you to take advantage of a fixed interest rate of 4 point 5 percent for 30 years? Once again, if you'd like additional information about this program

21

available to you, and to skip two payments, press the one key on your telephone. If you like to be placed on the do-not-call list, press nine, but press one to hear more.

141. My transcript for the 3 November 2010 (4:11) call (T73A112):

... incredible interest rate of 4 point 5 percent. If you'd like more information about this program press one on your phone right now. Are you in an adjustable rate loan that has already started to adjust or is going to adjust in the next 12 to 24 months? If so, take advantage of an incredible interest rate of 4 point 5 percent fixed for your 30 year mortgage and skip two payments. Would you like to tie up all of your debts in one first mortgage that will allow you to take advantage of a fixed interest rate of 4 point 5 percent for 30 years? Once again, if you'd like additional information about this program available to you, and to skip two payments, press the one key on your telephone. If you'd like to be placed on the do-not-call list, press nine, but press one to hear more.

142. My transcript for the 28 November 2010 call (T73A242):

... incredible interest rate of 4 point 5 percent. If you'd like more information about this program press one on your phone right now. Are you in an adjustable rate loan that has already started to adjust or is going to adjust in the next 12 to 24 months? If so, take advantage of an incredible interest rate of 4 point 5 percent fixed for your 30 year mortgage and skip two payments. Would you like to tie up all of your debts in one first mortgage that will allow you to take advantage of a fixed interest rate of 4 point 5 percent for 30 years? Once again, if you'd like additional information about this program available to you, and to skip two payments, press the one key on your telephone. If you'd like to be placed on the do-not-call list, press nine, but press one to hear more.

143. Most of the calls went to my answering machine, but I answered the 22 October 2010. I pressed a key and left a message, but I never received the callback. The call offered a 4.5 percent interest rate and mentioned skipping two payments. At the time, I wrote a note that "this sounds like earlier down south prerecord", but I did not follow that up and apparently forgot about it.

### D. Calls outside the Complaint

144. In addition to linking the above six prerecorded and two live calls, while working on the Complaint I discovered prerecorded mortgage calls on 29 November 2011. These calls are a year after the 2010 calls, and these calls are not alleged in the Complaint.

145. On 29 November 2011, the residential telephone number 650-948-6137 rang. I answered it in the kitchen, and it was a prerecorded call about mortgages. The telephone number 650-948-6137 has been on the National Do-Not-Call Registry for many years before this call. The call violated both private rights of action in the TCPA.

22

146.   While I was listening to that prerecorded call, the residential telephone number 650-948-1790 rang.  I dropped the first call, ran into my bedroom, and answered the 1790 line.  The call on that line played the same prerecorded message.

147.   The calls indicate couple things.  First, the caller did not subscribe to the National Do-Not-Call Registry; if the caller did, then the first call would not have been made.  Second, the caller was probably calling in telephone directory order.  In other words, the caller was calling every number in the telephone book.

148.   I started recording the second prerecorded message.  The transcript for this prerecorded call is (T79A062):

> … ??? This is David and we are here with an incredible offer of a 30-year fixed rate mortgage at 3.75 percent.  That's right.  Lock up your fixed 30-year loan at an incredible interest rate of 3.75 percent.  If you would like more information about this program, press 1 on your phone right now.  Are you <garbled>with an adjustable rate…
> [Touch tone]
> <garbled> state your name, telephone number, and a convenient time to reach you there, and we'll be back in touch.

149.   The Caller ID information for that prerecorded call presented a blank telephone number.

150.   The transcript has many similarities with the earlier prerecorded calls.  The voice is the same as the earlier calls.  The interest rate is different, but the voice was the same.  The transfer message after the touch tone is the same.

151.   I had left my name and number for a return call.

152.   I received a return call from "Mark Anthony" at C2 Mortgage on 30 November.  He said I had responded to the advertisement the previous day.  I told him I was sick.  He gave a telephone number of 800-935-5941 (last two digits transposed from 800-935-5914).  I am not aware of him calling back.

153.   The Caller ID information for the callback was blocked (private caller).

154.   I searched the Internet and determined that MARK AUGUSTUS and DONECIA AUGUSTUS were now originating loans for C2 Financial Corporation d/b/a C2 Mortgage.  See, for example, the website http://www.expertonyourteam.com.  That is the same website that MARK AUGUSTUS used in his email address in the documents he sent me.

23

155.  DONECIA AUGUSTUS' Nationwide Mortgage Licensing System (NMLS) page described above[18] states that she started representing C2 Financial in November 2011 and continues to represent them to the present day.

156.  Consequently, I believed these three calls were also from MARK AUGUSTUS and DONECIA AUGUSTUS but using a different mortgage broker, C2.  I sent a demand letter to C2 Financial Corporation and MARK AUGUSTUS on 29 May 2014.  I received replies from C2 Financial Corporation but not MARK AUGUSTUS.

157.  The November 2011 calls are not part of the Complaint.  I am not using them to seek damages, but they show that MARK AUGUSTUS and DONECIA AGUSTUS continued to use prerecorded calls and violate do-not-call requests.

## IX.   **CONCLUSION**

158.  I declare under penalty of perjury that the foregoing is true and correct.

159.  Executed on 1 December 2014 in Mountain View, California.

_Gerald Roylance_
Gerald Roylance

Exhibit A: Demand Letter
Exhibit B: NMLS record

---

[18] http://www.nmlsconsumeraccess.org/entitydetails.aspx/individual/349776

24

Declaration of Gerald Roylance in support of Application for Default Judgment

GERALD L. RO...

# FILE

Mark Fleischmann
AmeriFund Lending Group
ALG Real Estate Services, Inc.
31225 La Baya Dr Ste 211
Westlake Village, CA  91362-7343

Via Certified Mail

Mark Augustus
AmeriFund Lending Group
ALG Real Estate Services, Inc.
10642 Santa Monica Blvd Ste 205
Los Angeles, CA  90025-4896

Via Certified Mail

Dear Sir or Madam:

   PLEASE TAKE NOTICE that this letter is a demand under the California Legal Remedies Act (CLRA, California Civil Code §§ 1750 et seq), the Telephone Consumer Protection Act (TCPA, 47 USC § 227), California Business & Professions Code § 17200 et seq, and other laws.  The CLRA allows actual and punitive damages, injunctive relief, class actions, attorney fees, and other remedies.  The CLRA gives you thirty days to rectify the violations of Civil Code § 1770.

   You may wish to consult a lawyer.

   On May 28, 2010, I was peacefully eating dinner when my telephone rang.  My answering machine picked up on the second ring, but I picked up shortly thereafter.  It was a prerecorded call about a loan.  I never heard a company name or a telephone number.  I pressed one, and left a message for a call back.  The Caller Id information was blocked.

   Shortly after that, Mark called me back about the loan.  He referred to the call I just received.  I discussed refinancing a loan with him.  He gave me his complete name of Mark Augustus, and a telephone number of 1-800-935-5914.  Mark would mail some papers.  The Caller Id information on Mark's return call was also blocked.

   I believe Mark made some additional calls to me while blocking Caller Id.  I spoke with him again on June 1, 2010, and he said he would mail the package out that day.  The Caller Id information on that call was blocked.

   The package arrived on June 2; it was shipped from AmeriFund Lending, 10642 Santa Monica Blvd #205, Los Angeles, CA.  It identified AmeriFund Lending Group.  Mark

Ex A

– 2 –                                                                                 June 3, 2010

apparently cannot write paper.  The loan documents identified Donecia Montgomery at La Baya Drive as the loan originator.

The calls violate several state and federal statutes.  Prerecorded calls are prohibited.  See Public Utilities Code § 2871 et seq, Civil Code § 1770(a)(22), and 47 U.S.C. § 227(b)(1)(B). The calls violate other parts of 47 USC § 227 and its FCC regulations, the Public Utilities Code requirements for Caller ID, Business & Professions Code § 17500.3(a), and no doubt other statutes.

Blocking Caller Id shows that the caller is deliberately hiding his identity.  Legitimate advertisers want to display their name.  The calls were made with malice in that they consciously ignored my rights.  Furthermore, California requires the seller of an ADAD to inform the purchaser about the Public Utilities Code that restricts ADAD calls.  See Business & Professions Code § 17363.5.

I demand that you:

1)  Immediately cease using prerecorded calls.

2)  Immediately cease blocking Caller Id.

3)  Put my telephone number, 650 948-1790, on your company-specific do-not-call list.

4)  Send me a written copy of your do-not-call policy as required by 47 C.F.R. § 64.1200(d)(1).  Failure to provide this policy risks another $1,500 in TCPA statutory damages.

5)  Identify any organization making calls on your behalf.  Identify the organization's legal name, its address, and its principals.  Also identify the individuals with whom your company has contact and their address and telephone number.

6)  Provide the telemarketing scripts that you or your telemarketer used when it first called my residential telephone with a prerecorded call. The FTC Telemarketing Sales Rule ("TSR") requires you to keep this information for a period of two years.

7)  Provide any proof that we had an established business relationship.

8)  Provide any proof that I had given you prior express permission to call me.

9)  Preserve all business records about these and similar calls.

10) Pay $9,000 in statutory damages for six knowing violations of the TCPA subsection (b) (prerecorded call, failure to identify the caller, failure to provide a telephone number, and repeated calls without Caller ID – violations of FCC regulations under the TCPA).  There may be other violations

June 3, 2010

11) Pay $54,000 in punitive and/or exemplary damages for violations of the
   California Civil Code.

12) Provide a suitable remedy to all California residents who received your
   ADAD message without consent.  Fully describe the remedy to me.
   Minimum statutory damages under the TCPA are $500.

Please respond within 30 days. If you do not fully respond, then I will bring an action
against you that will include substantial statutory, punitive, and exemplary damages for
violations of the TCPA and California Civil Code.  There is statistical evidence that only 1 in
90,000 people sue over a TCPA violation when the caller identifies himself (see *United Artists
Theatre Circuit v. FCC*, 147 F.Supp.2d 965).

Both federal and state law make the officers or managers of a corporation liable for the
bad acts that they ordered or oversaw.

I will discuss any of these measures with you.

                                        Sincerely,

                                        Gerald Rovlance



## DONECIA LASHAUN AUGUSTUS

NMLS ID: **349776**    Phone: **800-935-5914**      Fax: **866-842-0669**

Other Names : **Donecia Lashaun Montgomery**    Prior Other Names : **None**        Prior Legal Names : **None**

State Regulatory Actions : None posted in NMLS.

### Employment

Authorized to Represent : **C2 Financial Corporation (135622)**          Engaged in other businesses : **Yes**

| From | To | Employer | Position | City | State | Zip Code | Financial Services |
|------|------|----------|----------|------|-------|----------|--------------------|
| 11/2011 | Present | C2 Financial | Independent Contractor | San Diego | CA | 92121 | Yes |
| 05/2010 | 11/2011 | Self | Real Estate Broker | Pacific Palisades | CA | 90272 | No |
| 11/2011 | 11/2011 | RC Mortgage Quest | Broker Associate | UPLAND | CA | 91786 | Yes |
| 05/2008 | 06/2010 | Amerifund | Independet Contractor | Westlake Village | CA | 91362 | Yes |
| 02/2007 | 05/2008 | American Lender Annex | Independent Contractor | San Clemente | CA | 92672 | Yes |
| 05/1996 | 02/2007 | Windsor Capital | Independent Contractor | San Diego | CA | 92121 | Yes |

### Office Locations

| Company | NMLS ID | Type | Street Address | City | State | Zip Code | Start Date |
|---------|---------|------|----------------|------|-------|----------|------------|
| C2 Financial Corporation | 135622 | Main | 10509 Vista Sorrento Pkwy #200 | San Diego | CA | 92121 | 11/18/2011 |
| RC MORTGAGE QUEST INC | 351714 | Main | 29605 Solana Way # E09 | Temecula | CA | 92591 | 11/08/2011 |

### State Licenses/Registrations   (Displaying 1 Active of 1 Total)

| Regulator | Lic/Reg Name | Authorized to Conduct Business | Consumer Complaint |
|-----------|--------------|-------------------------------|--------------------|
| **California - BRE** | Real Estate Broker License Endorsement | Yes | **Submit to Regulator** |

State Regulatory Actions      While some state agencies may add actions taken in previous years against a licensee, the majority are adding only new actions from 2012 or later. To view complete information regarding regulatory actions posted by the state, click any regulator link.

No regulatory actions have been posted in NMLS.

Information made available through NMLS Consumer Access℠ is derived from NMLS (Nationwide Mortgage Licensing System & Registry or Nationwide Multistate Licensing System), the financial services industry's online registration and licensing database. NMLS was created by the Conference of State Bank Supervisors (CSBS) and the American Association of Residential Mortgage Regulators (AARMR) and is owned and operated by the State Regulatory Registry LLC (SRR), a wholly owned subsidiary of CSBS. For more information about the System, please visit the NMLS Resource Center or the NMLS Federal Registry Resource Center websites. | Download PDF Reader

*Ex B*

1

Proof of Service by Mail

2

On 2 December 2014, I served the documents described as:

3

    1. Application for Default Judgment

4

    2. Memorandum in support of Application for Default Judgment

5

    2. Declaration of Plaintiff in support of Application for Default Judgment

on all interested parties in this action by placing a true and correct copy thereof in a sealed envelope,

6

with first-class postage prepaid thereon, and deposited said envelope in the United States mail at or in

7

Mountain View, California, addressed to

8

Mark Fleischmann
23734 Valencia Blvd Ste 206

9

Valencia, CA  91355-5365

10

Mark Augustus
15332 Antioch St PMB 516

11

Pacific Palisades, CA 90272

12

Donecia La Shaun Augustus
PO Box 35664

13

Los Angeles, CA 90035

14

    I declare under penalty of perjury that the foregoing is true and correct.  Executed on 2

15

December 2014 at Mountain View, California.

16

17

_Alice Roylance_
Alice Roylance

18

19

20

21

22

23

24

25

25

Declaration of Gerald Roylance in support of Application for Default Judgment